**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                         )
LASHAWN LEMMONS,                         )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        Civil Action No. 04-705 (RBW)
                                         )
GEORGETOWN UNIVERSITY                    )
HOSPITAL, et al.,                        )
                                         )
                    Defendants.          )
                                         )
_____)


**MEMORANDUM OPINION**

LaShawn Lemmons ("the plaintiff") brings this action against Georgetown University

Hospital ("Hospital") and Debbie Ellerby ("the defendants"),[1] alleging that they engaged in racial

and religious discrimination and retaliation against her in the course of her employment as a

laboratory technologist with the Hospital, in violation of the District of Columbia Human Rights

Act ("DCHRA"), D.C. Code § 2-1401 et seq. (2001), and 42 U.S.C. § 1981 (2000) ("Section

1981"). Amended Complaint ("Am. Compl.") ¶¶ 1-2. The plaintiff seeks declaratory and

injunctive relief as well as compensatory and punitive damages. Id. at 7. Currently before the

Court is the Defendants' Motion for Summary Judgment ("Defs.' Mot."). Submitted in

connection with the defendants' motion are the Plaintiff's Opposition to the Defendants' Motion

for Summary Judgment ("Pl.'s Opp.") and the Defendants' Reply in Further Support of their

---

[1] Debbie Ellerby is the Administrative Director of the Department of Laboratory Medicine at the Hospital.
Defs.' Mot., Ex. 2 (Declaration of Debbie Ellerby) ¶ 1 ("Ellerby Decl.").

1

Motion for Summary Judgment ("Defs.' Reply").  For the reasons set forth below, the Court

grants in part and denies in part the defendants' motion for summary judgment, and remands the

plaintiff's remaining claim to the Superior Court of the District of Columbia.

## I. Background

The following facts are not in dispute.  The plaintiff, a resident of Washington, D.C.,

began her employment with Georgetown University Hospital's Microbiology Laboratory as an

at-will, part-time laboratory technologist in 1999.  Defs.' Mot. ¶ 1; Defs.' Mot., Exhibit ("Ex.") 1

(Plaintiff's Deposition) at 18, 57 ("Pl.'s Dep.").  In April 2001, the plaintiff was given an

additional part-time position in the Hospital's Chemistry Laboratory.  Defs.' Mot. ¶ 4; Am.

Compl. ¶ 12.  Both laboratories have work stations known as "benches," on which various

diagnostic tests are performed on specimens received from patients.  Defs.' Mot., Ex. 2

(Declaration of Debbie Ellerby) ("Ellerby Decl.") ¶ 4; Pl.'s Dep. at 85.  The plaintiff was not, and

is not, trained to perform all of the tasks associated with each of the benches in the Microbiology

and Chemistry Laboratories.  Defs.' Reply at 5; Pl.'s Opp. at 5 ¶¶ 5-6.

## A. The plaintiff's harassment complaint

In the spring of 2002, the plaintiff spoke to her supervisors, Marcia Betaharon and Zahra

Fakhraei, regarding what she perceived to be the improper storage of tuberculosis ("TB")

samples in the Hospital's main laboratory incubator.  Defs.' Mot. ¶ 12; Am. Compl. ¶¶ 15-16.  In

May 2002, "[w]hen no action was taken . . . to remedy the improper handling and storage of the

TB samples," Am. Compl. ¶ 17, the plaintiff submitted a memorandum to defendant Ellerby and

other Hospital personnel, alleging that she was being harassed by Betaharon, Defs.' Mot. ¶ 18;

Am. Compl. ¶ 18.[2]  Specifically, the plaintiff stated:

> For the past several months, I have been the target of some very deliberate and cruel harassment devices employed by senior Team Leader, Marcia Betaharon.  On more than one occasion, Mrs. Betaharon has violently lashed out at me in a most offensive and vile manner.  I find her language coarse, abusive, insulting, and inappropriate.  I have also repeatedly overheard Mrs. Betaharon blatantly gossiping about me with other employees.  She further demonstrates her inability to adhere to the standards of professional conduct by communicating important issues with me through notes or other employees. . . .  Marcia Betaharon is increasingly using her power as Team Leader to unjustifiably criticize and complain about my work performance in such a way as to question the validity of my skills as a Microbiology Tech.  It is an almost weekly occurrence that Zahra [Fakhraei] approaches me with work quality issues raised by Marcia Betaharon.

Pl.'s Opp., Ex. F (May 22, 2002 letter from LaShawn Lemmons to Sharon Novak, Debbie

Ellerby, Zeni Evangelista, and David Garvin) at 1.  Nowhere in the plaintiff's memorandum did

she intimate that the harassment she described was racially-based or racially-motivated.  See

generally id.  In fact, the plaintiff later testified that she did not believe that Betaharon was

harassing her on account of her race.[3]  Pl.'s Dep. at 57.

The plaintiff's allegations of harassment were investigated by the Hospital.  See Defs.'

Mot. ¶¶ 21-24; Pl.'s Opp., Ex. L (May 28, 2002 letter from Sharon Novak to LaShawn

Lemmons); Pl.'s Opp., Ex. P (July 15, 2002 letter from Randy Gadson to LaShawn Lemmons).

As a result of this investigation, in July 2002 Ellerby discovered for the first time that the

---

[2]  The plaintiff also alleges that she received "a lowered performance appraisal" in 2002 following her complaints regarding the storage of the TB samples and the alleged harassment by Betaharon.  Am. Compl. ¶ 21(a).  She further alleges that she "was denied a performance-based salary bonus" as a result of the lowered appraisal.  Id.  However, it is undisputed that each of the plaintiff's evaluations, before and after the 2002 complaints, rated her performance as "meets expectations."  Defs.' Mot. ¶ 62; Pl.'s Opp. at 14 ¶ 62.  The plaintiff's claim in this regard is thus not supported by the factual record.

[3]  The plaintiff is African-American.  Am. Compl. ¶ 23; Defs.' Mot. at 2 ¶ 1.

plaintiff was not fully trained as a laboratory technologist in the Microbiology Laboratory.  Defs.'

Mot. ¶ 25; Pl.'s Opp. ¶ 25; Defs.' Mot., Ex. 14 (July 31, 2002 letter from LaShawn Lemmons to

Debbie Ellerby); Pl.'s Opp., Ex. M (August 5, 2002 letter from Debbie Ellerby to LaShawn

Lemmons).  Having ascertained that all other laboratory technologists were trained on their

benches, Ellerby Decl. ¶ 7, Ellerby met with the plaintiff to request that she receive the

appropriate training on the Microbiology benches, Pl.'s Opp., Ex. M; Ellerby Decl. ¶¶ 6-8.[4]

Rather than accede to the additional training, in August 2002 the plaintiff expressed an interest in

resigning from her position as a laboratory technologist in the Microbiology Laboratory and

working exclusively in a full-time capacity in the Chemistry Laboratory.  Pl.'s Opp. at 9 ¶ 25;

Defs.' Mot., Ex. 16 (August 30, 2002 letter from Debbie Ellerby to LaShawn Lemmons) at 1.  In

response, Ellerby told the plaintiff that she would need to be fully trained on the benches in the

Chemistry Laboratory in order to become a full-time laboratory technologist in that department.

Defs.' Mot., Ex. 16 at 1.  Alternatively, Ellerby offered to transfer the plaintiff into the "newly

developed job description of Accessioning Technologist," which would allow the plaintiff to

retain all of her job duties in the Microbiology Laboratory without undergoing any further

training.  Id.  The position of accessioning technologist was one pay grade below that of

laboratory technologist, but the plaintiff would "continue to be paid at the same hourly rate" if

she chose to transfer to the new position.  Id.

---

[4]  At that same time, Ellerby also informed the plaintiff that she would be scheduled to work a weekday, full-time shift in the Microbiology Laboratory until she obtained the required training, at which time she would resume her normal schedule in the Microbiology and Chemistry Laboratories.  Defs.' Mot. ¶ 30; Pl.'s Opp., Ex. M. The plaintiff does not dispute that it was necessary for her to work the day shift to complete the training, because the training was not available at night.  Defs.' Mot. ¶ 30; Pl.'s Opp. at 10 ¶ 30 (offering no dispute).  Ellerby acknowledged that because the plaintiff would not be working the night shift during her training period, she would lose $82.26 per pay period.  Pl.'s Opp., Ex. M.  To recoup this lost income, Ellerby suggested that the plaintiff could volunteer to work at least three hours of overtime per pay period until her training was completed.  Id.

The plaintiff refused to participate in additional training in both the Microbiology and Chemistry Laboratories "because she feared the training was designed to set her up for termination."[5]  Pl.'s Opp. ¶ 32.  Instead, the plaintiff elected "with great reservations" to transfer to the part-time accessioning technologist position, where she remains to this date.  Defs.' Mot., Ex. 15 (September 23, 2002 letter from LaShawn Lemmons to Debbie Ellerby) at 2; Pl.'s Opp. ¶ 36 (stating that the plaintiff "currently works 20 hours per week" as an accessioning technologist); Ellerby Decl. ¶ 11 (stating that the plaintiff's "current title is Accessioning Technologist").

## B. The plaintiff's refusal to take a PPD skin test

The plaintiff and the defendants also clashed over the Hospital's policy that all District of Columbia employees involved in direct or indirect patient care receive an annual health examination, including a tuberculin Purified Protein Derivative ("PPD") skin test, also known as a Mantoux test.[6]  Defs.' Mot., Ex. 18 (Georgetown University Hospital Health Policy 501) at 1, 3.  The PPD test is designed to detect the presence of the tuberculosis virus.  Defs.' Mot. ¶ 44; Pl.'s Opp. at 12 ¶ 44.  The plaintiff does not dispute that she is involved in the indirect care of patients and is therefore required, under Hospital policy, to undergo a PPD skin test as part of her annual health clearance.  Defs.' Mot. ¶ 44; Pl.'s Opp. at 12 ¶¶ 44-45.  Nor does the plaintiff

---

[5]  The plaintiff further states that she "was reluctant to agree to additional training because she felt she was being railroaded into an unfair training regime that would ultimately lead to her termination."  Pl.'s Opp. ¶ 41.

[6]  The Hospital's policy is patterned on District of Columbia regulations requiring that all employees involved in the direct care of patients receive an annual health examination including an intradermal tuberculin test.  22 DCMR § 2102; see also Defs.' Mot. ¶¶ 44-46.  However, the plaintiff disputes that she is involved in direct patient care.  Pl.'s Opp. at 12 ¶ 45.  In any event, whether or not the plaintiff was bound by District of Columbia regulations to receive such a test, it is undisputed that she was required to receive an annual health examination and PPD skin test pursuant to Hospital policy.

dispute that employees who refuse to take the PPD test may be suspended, discharged, or transferred to a non-clinical position.[7]  Defs.' Mot. ¶ 47; Pl.'s Opp. at 12 ¶ 47;

In March 2002, Ellerby received notice from Paula Sullivan, the Hospital's Director of Health Services, that the plaintiff's 2002 PPD test was overdue.  Ellerby Decl. ¶ 12.  Ellerby subsequently notified the plaintiff that her annual health clearance could not be processed until she took the skin test or produced a deferral note from her physician.  Defs.' Mot., Ex. 23 (March 6, 2002 memorandum from Debbie Ellerby to LaShawn Lemmons).  The plaintiff then submitted a physician's note requesting that the Hospital exempt her "from taking the skin tests for tuberculosis because of medical reasons."  Defs.' Mot., Ex. 24 (March 28, 2002 note from Dr. Kumuda Reddy); see also Defs.' Mot. ¶ 51.  Accordingly, the Hospital permitted the plaintiff to defer taking the PPD skin test in 2002.[8]  Defs.' Mot. ¶¶ 51-52.

In April 2003, the Hospital renewed its request that the plaintiff take the annual PPD skin test.  Defs.' Mot. ¶ 53; Pl.'s Opp. at 13 ¶ 53.  Again the plaintiff produced a note from her physician, which stated simply, "Please exempt [the plaintiff] from tuberculosis skin test."  Defs.' Mot., Ex. 25 (April 24, 2003 note from Dr. Kumuda Reddy); see also Defs.' Mot. ¶ 54;

---

[7]  The defendants contend that the Hospital's health clearance policies are "strictly enforce[d]" and that "an employee's failure to take the required PPD test presents a significant risk of liability for the Hospital."  Defs.' Mot. ¶ 47.  The plaintiff does not dispute these contentions.  Pl.'s Opp. at 12 ¶ 47.

[8]  Other than her 2002 deferral, the plaintiff claims to have received deferrals from the Hospital for PPD tests in 1999, 2000, and 2001.  Pl.'s Opp. at 13 ¶ 57.  This claim is supported, in part, by the plaintiff's unsigned, undated declaration, discussed infra, which states that "[f]or several years, [the plaintiff] had requested that [she] be excused from taking the PPD tuberculosis skin test, because of both [her] religious beliefs, and because [she] feared the TB injection would negatively impact [her] health," and that the Hospital "allowed exemptions in 1999, 2001, and 2002."  Pl.'s Opp., Ex. A (Declaration of LaShawn Lemmons) ("Lemmons Decl.") ¶¶ 48-49.  The plaintiff's deposition testimony further suggests that she had a PPD test performed in 2000.  Pl.'s Dep. at 170.  In any event, because the Court remands the plaintiff's remaining claim to the Superior Court of the District of Columbia, it is unnecessary for it to determine exactly how many times, prior to 2002, the plaintiff obtained a deferral from the Hospital, and for what reasons.

Pl.'s Opp. at 13 ¶ 54.  After receiving the physician's note, the Hospital apparently deferred the

plaintiff's PPD test once more.  Pl.'s Dep. at 180 (stating that PPD test was deferred in April

2003).

In addition to objecting to submitting to the PPD tests for medical reasons, the plaintiff

also raised a religious objection to the tests, presenting the Hospital with two letters signed by the

Pastor of the Congregation of Universal Wisdom.  Defs.' Mot., Exs. 27 and 28 (August 26, 2003

and September 26, 2003 letters from Walter P. Schilling); Defs.' Mot. ¶ 56; Pl.'s Opp. at 13 ¶ 56.

The first letter, dated August 26, 2003, stated that under the tenets of the church, "[t]he injection

into the body of medication or other matter or substance that defy natural law" is sacrilegious.

Defs.' Mot., Ex. 27.  The letter then specifically stated that "[t]he Mantoux Test is an intradermal

injection of tuberculin and as such . . . [i]t is forbidden."  Id.  The second letter, dated September

26, 2003, confirmed that the plaintiff belonged to the Congregation of Universal Wisdom, and

reiterated that "[n]o member of the Congregation shall have injected, ingested, or infused into the

body any foreign materials of unhealthy or unnatural composition."  Defs.' Mot., Ex. 28.  It is

undisputed that the defendants received these letters.  Defs.' Mot. ¶ 56 ("[The p]laintiff also

presented two letters allegedly signed by the Pastor of her Church. . . .  These letters state that

Tuberculosis tests are forbidden by the religious tenants [sic] of the Congregation of Universal

Wisdom.").

In September 2003, the plaintiff also produced another note from her physician, which

requested that she not be given the PPD skin test "due to fear of allergic reaction."  Defs.' Mot.,

Ex. 26 (September 26, 2003 note from Dr. Kumuda Reddy).  On November 4, 2003, Paula

Sullivan e-mailed Dr. Princy Kumar, Chief of the Division of Infectious Diseases, regarding the

plaintiff's refusal to take the PPD test. Defs.' Mot., Ex. 29 (November 4, 2003 e-mail). In the e-mail, Sullivan wrote:

> There is an employee who is an indirect patient care provider (lab tech) who has suddenly decided that she is not going to get a PPD because "I don't like putting anything in my body." She also . . . brought a note from her doctor that said "Please excuse Ms. [blank] from the PPD because of her fear of an allergic reaction." I do not think this is appropriate, and feel she needs to follow hospital policy which requires her to have a PPD as a condition of employment.

Id. Dr. Kumar responded that she "[f]ully and totally" supported Sullivan's decision that the plaintiff's reasons for refusing the PPD test were unacceptable, and added that the plaintiff "should not work in a health care facility." Id. Notably, Sullivan's e-mail makes no mention of the plaintiff's religious objections to the test.

On November 19, 2003, Sullivan issued a Statement of Work Status, which indicated that the plaintiff was "not able to perform the essential functions of [her] job" due to her refusal to take the PPD skin test. Defs.' Mot., Ex. 30 (Statement of Work Status). On that same day, Ellerby mailed the plaintiff a letter informing her that she was suspended without pay as of November 21, 2003, because of her "failure to comply with the health care requirements at Georgetown University Hospital." Defs.' Mot., Ex. 31 (November 19, 2003 letter from Debbie Ellerby to LaShawn Lemmons). The letter further stated that the plaintiff had thirty days from the effective date of her suspension – that is, until December 21, 2003 – to complete all elements of her annual physical clearance, or else she would be terminated. Id.

On December 17, 2003, the plaintiff submitted a note to the Hospital from Dr. John McNeil, Chief of Infectious Diseases at Howard University Hospital. Defs.' Mot., Ex. 36 (December 17, 2003 note from Dr. John McNeil). The note stated that the plaintiff had been

evaluated for evidence of active tuberculosis and that "[b]ased on a detailed history and physicial

examination," including a chest x-ray, Dr. McNeil found "no evidence of an active tuberculosis

infection or any evidence of a chronic inflammatory process." Id. In her complaint, the plaintiff

alleges that the Hospital "refused to allow" her to use the chest x-ray examination as a

substitution for the PPD test. Am. Compl. ¶ 21(l). However, the defendant contends, and the

plaintiff does not dispute, that chest x-rays are not an adequate substitute for PPD skin tests,

because a latent tuberculosis infection, although it can be identified by a PPD test, "does not

show up on a chest x-ray." Defs.' Mot., Ex. 20 (Deposition of Paula Sullivan) ("Sullivan Dep.")

at 26; see also Defs.' Mot. ¶ 69; Pl.'s Opp. at 14 ¶ 69 (not disputing the defendants' contention

that the chest x-ray is not a substitute for a skin test). Although the Hospital apparently rejected

as insufficient the plaintiff's note from Dr. McNeil, there is little indication in the record

whether, or when, the plaintiff ultimately submitted to the PPD skin test and was reinstated from

her suspension.[9] See generally Defs.' Mot.; Pl.'s Opp.; Defs.' Reply. Regardless, as previously

noted, the plaintiff remains employed by the Hospital as a part-time accessioning technologist.

Pl.'s Opp. ¶ 36; Ellerby Decl. ¶ 11.

**C. The plaintiff's lawsuit**

On September 22, 2003, before her suspension for refusing to take the PPD skin test, the

plaintiff, acting pro se, filed a lawsuit against the defendants in the Superior Court of the District

of Columbia. Defs.' Mot., Ex. 30 (Complaint). Following her suspension, the plaintiff retained

counsel and filed an amended complaint on May 9, 2004. Am. Compl. at 8. In her amended

---

[9] The plaintiff claims in her opposition that she took the PPD test in 2004 and suffered an allergic rash as a result. Pl.'s Opp. at 13 ¶ 55. The only support for this claim is the plaintiff's undated, unsigned declaration, which, as discussed infra, is of questionable evidentiary value. Lemmons Decl. ¶ 52.

complaint, the plaintiff alleges discrimination and retaliation under the DCHRA, which

"provid[es] for a private right of action against employment discrimination on the basis of, inter

alia, race, color, sex, national origin and religion," and Section 1981, "which provides for

injunctive, equitable, and other relief against discrimination in employment on the basis of race,

religion, national origin, and color."[10]  Id. ¶¶ 1-2.  Specifically, the plaintiff alleges that the

defendants "engaged in a concerted pattern of discrimination and retaliation against her," which

included: (1) reducing her hours, "thus denying [her] the opportunity to continue working in a

full-time capacity, causing [her] to lose her health insurance and other benefits"; (2) refusing to

allow her to work overtime; (3) demoting her one grade in salary; and (4) telling her "that she

was no longer qualified to perform the duties she had been performing satisfactorily for almost

three years."  Id. ¶ 21.  The plaintiff therefore claims that the defendants "have intentionally

engaged in discrimination and retaliation against [her] because of her race and because of her

protected activity," violating the DCHRA and Section 1981.[11]  Id. ¶¶ 26, 29.  In support of her

racial discrimination claim, the plaintiff contends that "it is the policy and practice [of the

Hospital] to pay African American women much less in salary and compensation than it

regularly pays to White females," and, furthermore, that African-American women at the

---

[10]  The plaintiff's amended complaint also alleges violations of the First Amendment of the United States Constitution.  Am. Compl. ¶¶ 3, 31-32.  However, the plaintiff now concedes that she has not stated a cognizable claim under the First Amendment.  Pl.'s Opp. at 36.  Accordingly, the Court dismisses the plaintiff's First Amendment claim.

[11]  As part of her racial discrimination claims, the plaintiff alleges that the defendants refused to consider her "for a vacant full-time position as a Laboratory Technologist in the Chemistry Department of the Georgetown Medical Center."  Am. Compl. ¶ 21(d).  It is unclear from the pleadings whether this is the same position about which the plaintiff expressed an interest in August 2002 and was told that the position required that she be fully trained on the benches, Pl.'s Opp. at 9 ¶ 25, 12 ¶ 42; Defs.' Mot., Ex. 16 at 1, or whether this is a different "Medical Technologist" position for which the plaintiff allegedly did not possess the proper certification, Defs.' Mot. ¶¶ 42-43; Pl.'s Opp. at 12 ¶ 43; Defs.' Reply at 5-6.  In either event, the Court concludes, infra, that the plaintiff has failed to establish a prima facie case that the failure to consider her for the position was racially motivated.

Hospital, including the plaintiff, "have been subjected, and are being subjected to disparate treatment in the terms and conditions of their employment." Id. ¶¶ 22-23.  The plaintiff also states that she "refused to take the Mantoux PPD tuberculosis test on religious and medical grounds," although she does not expressly set forth a cause of action for religious discrimination in the Statement of Claims section of her amended complaint.  Id. ¶¶ 21(k), 24-34.

On May 20, 2005, the defendants moved for summary judgment, arguing, inter alia, that the plaintiff had failed to demonstrate the existence of racial animus, race-based harassment, or disparate treatment among similarly situated individuals based on race sufficient to establish a prima facie case of racial discrimination.[12]  Defs.' Mot. at 31-33, 35-41; Defs.' Reply at 7-12. Furthermore, the defendants contend that they had a legitimate, non-discriminatory reason for suspending the plaintiff based on her refusal to take the PPD skin test.  Defs.' Mot. at 44.  In response, the plaintiff argues that summary judgment is improper because "the undisputed facts on the record . . . clearly show that [she] was discriminated against because of her race and has been subjected to a pattern of retaliatory acts and hostile environment because of her protected activity."  Pl.'s Opp. at 2.  The plaintiff also argues that the evidence demonstrates that "the Defendants' proffered justifications for the adverse actions taken against [her] are purely pretextual, or unworthy of credence."  Id.

---

[12]  The defendants also argue that all of the plaintiff's DCHRA claims, other than those arising from her 2003 suspension, are time-barred by the applicable one-year statute of limitations.  Defs.' Mot. at 22-30.  Because the Court concludes that the plaintiff has failed to establish a prima facie case as to any of her racial discrimination and retaliation claims under the DCHRA and Section 1981, it need not address the defendants' statute of limitations argument.

## II.  Standard of Review

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56(c) if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or denials."  Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (quotation marks omitted).  "[C]onclusory allegations unsupported by factual data will not create a triable issue of fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted).  Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted).  Under Rule 56(c), if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is warranted.  Fox v. Giaccia, No. 03-2369, ___ F. Supp. 2d ____, ____, 2006 WL 751340, *4 (D.D.C. March 23, 2006) (Walton, J.) (quoting Celotex, 477 U.S. at 323).

12

## III. Analysis

### A. The plaintiff's claims of race discrimination

"The legal standards applicable to race discrimination are the same under the DCHRA

and [Section] 1981." Fox, No. 03-2369, ___ F. Supp. 2d at ____, 2006 WL 751340 at *5

(quoting Beckwith v. Career Blazers Learning Ctr. of Washington, D.C., Inc., 946 F. Supp. 1035,

1048 (D.D.C. 1996)).  Both claims require proof of intentional discrimination, which may be

shown by direct or indirect evidence.  Id.; see also McGill v. Munoz, 203 F.3d 843, 845 (D.C.

Cir. 2000).  "Direct evidence of discrimination is evidence that, if believed by the fact finder,

proves the particular fact in question without any need for inference. . . .  [Such evidence]

includes any statement or written document showing a discriminatory motive on its face."  Davis

v. Ashcroft, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005) (Walton, J.) (internal quotation marks

and citations omitted) (emphases in original).  The plaintiff does not contend that she has

produced direct evidence of discriminatory intent, see generally Pl.'s Opp., and the Court

concludes that there is no such evidence in the record.

Where, as here, the plaintiff has proffered no direct evidence of intentional

discrimination, race discrimination claims under both the DCHRA and Section 1981 are

evaluated using the same framework as claims arising under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq. (2000).  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549,

1553 (D.C. Cir. 1997).  This framework, first articulated by the Supreme Court in McDonnell

Douglas v. Green, 411 U.S. 792 (1973), is explained as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a
> prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the
> prima facie case, the burden shifts to the defendant to articulate some legitimate,

> nondiscriminatory reason for the employee's rejection.  Third, should the defendant
> carry this burden, the plaintiff must then have the opportunity to prove by the
> preponderance of the evidence that the legitimate reasons offered by the defendant
> were not its true reasons, but were a pretext for discrimination.

Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (quoting McDonnell

Douglas, 411 U.S. at 802, 804) (internal quotation marks omitted).  In evaluating a claim of race

discrimination, it is important to remember that "[a]lthough the McDonnell Douglas framework

shifts intermediate evidentiary burdens between the parties, the ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff."  Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir.

2003), cert. denied, 540 U.S. 881 (2003) (quoting Reeves, 530 U.S. at 143) (internal quotation

marks omitted).  Thus, "to survive summary judgment the plaintiff must show that a reasonable

jury could conclude from all the evidence that the adverse employment decision was made for a

discriminatory reason."  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  In this regard,

the Court must consider, "in its full context,"  all of the evidence in the record.  Aka v.

Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 2002) (en banc).  This includes "(1)

evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack

the employers proffered explanation for its actions; and (3) any further evidence of

discrimination that may be available to the plaintiff, such as independent evidence of

discriminatory statements or attitudes on the part of the employer."  Holcomb, 433 F.3d at 897.

As noted, however, "the plaintiff must first establish a prima facie case of

discrimination."  Davis, 355 F. Supp. 2d at 338 (citation omitted); see also Mitchell v. DCX,

Inc., 274 F. Supp. 2d 33, 39 (D.D.C. 2003) (stating that "[s]ummary judgment is appropriate in a

discrimination case where . . . the evidence is insufficient to establish a <u>prima</u> <u>facie</u> case."). To

establish a <u>prima facie</u> case, "the plaintiff must demonstrate that (1) she is a member of a

protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action

gives rise to an inference of discrimination." <u>Turner v. District of Columbia</u>, 383 F. Supp. 2d

157, 167 (D.D.C. 2005) (citations omitted); <u>see</u> <u>also</u> <u>Stella v. Mineta</u>, 284 F.3d 135, 145 (D.C.

Cir. 2002).

The defendants challenge the plaintiff's satisfaction of the third element required to

establish a <u>prima facie</u> case under the DCHRA and Section 1981; that is, the inference of

discrimination.[13]  Defs.' Mot. at 31-33, 35-36; Defs.' Reply at 1-3, 7-9.  Specifically, the

defendants argue that the plaintiff "has failed to contradict the arguments and record evidence in

this case that her race played no role in the alleged adverse actions."  Defs.' Reply at 9.  Having

examined all of the pleadings, exhibits, and affidavits in this case, the Court agrees with the

defendant and finds that the plaintiff has completely failed to demonstrate that any of the

unfavorable employment decisions alleged in the complaint give rise to an inference of

intentional discrimination.  Accordingly, the Court concludes that the plaintiff has not established

a <u>prima facie</u> case of race discrimination under the DCHRA or Section 1981.

"A <u>prima facie</u> case requires evidence adequate to create an inference that an employment

decision was based on an illegal discriminatory criterion." <u>Teneyck v. Omni Shoreham Hotel</u>,

254 F. Supp. 2d 17, 22 (D.D.C. 2003) (Walton, J.), <u>aff'd</u>, 365 F.3d 1129 (D.C. Cir. 2004)

---

[13]  The defendants also contend that the plaintiff has not satisfied the second prong of a <u>prima facie</u> case,
arguing that neither the Hospital's requirement that the plaintiff fully train on the benches in the Microbiology and
Chemistry laboratories, nor its creation of the Accessioning Technologist position when the plaintiff refused such
training, can properly be characterized as adverse employment actions.  Defs.' Mot. at 33-35, 40-41.  Because the
Court concludes that the plaintiff plainly fails to establish a <u>prima facie</u> case of race discrimination, it need not
consider whether or not the actions at issue qualify as "adverse."

(quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996)) (internal quotation marks omitted).  The plaintiff may establish an inference of discrimination "by demonstrating that she was treated differently from similarly situated employees who are not part of [her] protected class." George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) (citations omitted); see also Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999).  Alternately, the plaintiff may make a showing that the adverse employment action "was not attributable to [a] common, legitimate reason[] . . . such as performance below the employer's expectations." George, 407 F.3d at 415. Here, the plaintiff has adduced no facts from which the Court or a jury can reasonably infer that the adverse employment decisions alleged by the plaintiff were made for discriminatory reasons. See Lathram, 336 F.3d at 1088.  The plaintiff provides no objective evidence to suggest that the adverse actions taken against her occurred because of her race, nor that similarly situated individuals of other races were treated differently than she was; rather, she "merely speculates" that her race played a role in the defendants' employment decisions.  Teneyck, 254 F. Supp. 2d at 22 (emphasis omitted); see also Galdamez v. Xerox Corp., 05-7047, 2006 WL 593675, *1 (D.C. Cir. Feb. 16, 2006) (per curiam) (affirming district court's conclusion that the plaintiff failed to establish a prima facie case of termination based on ethnicity); Fox, No. 03-2369, ___ F. Supp. 2d at ____, 2006 WL 751340 at *5 (stating that "the plaintiff must offer something beyond her own speculations and allegations" to defeat a motion for summary judgment); Powell v. Washington Metro Area Transit Auth., 238 F. Supp. 2d 160, 165 (D.D.C. 2002) (stating that the plaintiff offered no "objective basis for an inference of discrimination, thus defeating her prima facie case").

In discrimination cases, "the central focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) (internal quotation marks and citations omitted). Here, despite months of discovery, the plaintiff has utterly failed to provide evidence from which a reasonable jury could infer that the defendants acted in a racially discriminatory manner. Lathram, 336 F.3d at 1088. The sum total of the plaintiff's purported evidence in this regard is as follows.

First, the plaintiff alleges in her complaint that "[u]pon information and belief, it is the policy and practice [of the Hospital] to pay African American women much less in salary and compensation than it regularly pays to White females," and, furthermore, that African-American women at the Hospital, including the plaintiff, "have been subjected, and are being subjected to disparate treatment in the terms and conditions of their employment." Am. Compl. ¶¶ 22-23. It is axiomatic, however, that such bare and conclusory statements, without further evidentiary support, are not sufficient to survive summary judgment. See, e.g., Celotex, 477 U.S. at 324 (stating that the plaintiff must "go beyond the pleadings and by her own affidavits, or depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial") (internal quotation marks and citation omitted); Pub. Citizen Health Research Group, 185 F.3d at 908 (stating that "conclusory allegations unsupported by factual data will not create a triable issue of fact") (internal quotation marks and citations omitted).

Second, the plaintiff makes several references in her deposition to other employees who she alleges were treated differently because of their race. Pl.'s Dep. at 40, 253-54. Specifically,

she states that she "watched [Marcia] Betaharon get a black woman fired during the same – she

took the same steps.  When she doesn't like someone she falsely accuses someone of bad work

performance and I watched her do this to another black woman who was subsequently fired."  Id.

at 40.  The plaintiff identifies this woman as Marjorie Cooper.  Id.  The plaintiff also appears to

allege that the complaint of a white co-worker, Amy Dom, regarding the storage of anthrax

cultures was treated with greater concern than her own similar complaint about the tuberculosis

samples.[14]  Id. at 254.  In addition, the plaintiff makes vague allusions to other African-American

women who have been fired by the defendants in the past:

> [W]hen I spoke out or when blacks speak out about unfair treatment, about being
> retaliated against, about being harassed, about being discriminated against, or when
> blacks speak out about bad lab practices or being harassed by other employees, you
> know, as what happened to me I got demoted, suspended, my hours were cut, my
> weekend job was terminated, I got an unfair performance appraisal.

Id. at 253.  The relevant portions of the depositions submitted as part of the record, however, are

brief and incomplete; in them, the plaintiff only partially begins to set forth the details of the

alleged incidents.  As such, it is impossible for the Court to draw any reasonable inferences

regarding these incidents from the record before it.  See Carter v. George Wash. Univ., 387 F.3d

872, 884 (D.C. Cir. 2004) (stating that the plaintiff's failure to mention the existence of a

particular contractual clause "during the portion of her depositions that are part of the record" left

the fact-finder unable to reasonably infer the existence of such a clause); Calvetti v. Antcliff, 346

F. Supp. 2d 92, 101 n.10 (D.D.C. 2004) (Walton, J.) (stating that where a party "has failed to

provide [the] Court with the relevant portions of the deposition testimony, the Court is unable to

---

[14]  Neither party submitted affidavits or deposition transcripts from Cooper or Dom, nor does the plaintiff
refer to either employee in her opposition to the defendants' motion for summary judgment.  See generally Pl.'s Opp.

entertain [certain] arguments").  For example, the Court is entirely unable to infer, from the

patchwork deposition transcripts that have been submitted as part of the record, that the

employees referred to were similarly situated, that they were, in fact, treated differently than the

plaintiff, or that the defendants in this case have engaged in intentional discrimination on the

basis of race.  Moreover, to the extent the purported events related by the plaintiff in her

deposition were based on second-hand information rather than personal knowledge, they amount

to inadmissible hearsay and may not be considered in resolving a motion for summary judgment.

Singleton v. Potter, 402 F. Supp. 2d 12, 37 (D.D.C. 2005) (observing that "[o]nly that portion of

a deposition that would be admissible in evidence at trial may be introduced on a summary

judgment motion") (internal quotation marks and citation omitted); see also Cottrill v. MFA,

Inc., No. 05-1748, ___ F.3d ____, ____, 2006 WL 894963, *5 (8th Cir. Apr. 7, 2006) ("At the

summary judgment stage, we do not consider portions of depositions that were made without

personal knowledge or consist of hearsay.").

        Finally, the plaintiff states in her undated, unsigned declaration that she was unwilling to

undertake the requested training in the Microbiology and Chemistry laboratories due to "the fact

that just one year earlier, another African American woman, Marjorie Cooper, was terminated

under the same guise of 'retraining,' after Marcia Betaharon complained of her work

performance."[15]  Pl.'s Decl. ¶ 42.  The plaintiff goes on to assert that "[a]t no time since [her]

_____

        [15]  The defendants argue that the plaintiff's unsworn declaration is, on its face, inadmissible hearsay, which
fails to satisfy the requirements of 28 U.S.C. § 1746 (2000) (Unsworn Declarations Under Penalty of Perjury).
Defs.' Reply at 6-7; see Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6 (D.C. Cir. 1998)
(holding that "an affidavit . . . consisting entirely of inadmissible hearsay[] is not sufficient to survive summary
judgment").  Section 1746 states that an unsworn declaration is nevertheless admissible if it is certified "in writing of
such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following
form: . . . "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.
(continued...)

employment had any white employee, in similar situations, been subjected to the same hostilities and reprimands" as she was.  Id.  These statements, however, provide nothing but the barest outline of the events described and offer no indication as to the basis of the plaintiff's personal knowledge; as such, they are conclusory and unsubstantiated, and cannot stand on their own to defeat a motion for summary judgment.  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (refusing to consider "conclusory allegations" unsupported by facts in evaluating lower court's grant of summary judgment); see also Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").  Moreover, "self-serving affidavits alone will not protect the non-moving party from summary judgment."  Carter v. George Wash. Univ., 180 F. Supp. 2d 97, 111 (D.D.C. 2001), aff'd, 387 F.3d 872 (D.C. Cir. 2004).

The plaintiff has produced no evidence "adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."  O'Connor, 517 U.S. at 312 (internal brackets, quotation marks, and citation omitted).  She has not demonstrated "that she was treated differently from similarly situated employees who are not part of [her] protected class," nor has she shown that the adverse employment actions enumerated in her complaint could not have been "attributable to [a] common, legitimate reason[] . . . such as performance below the employer's expectations."  George 407 F.3d at 415 (citations omitted).  To the

---

[15](...continued)

Executed on (date)."  28 U.S.C. § 1746.  The plaintiff's declaration is neither signed nor dated, and states: "I, LaShawn Lemmons, hereby declare under penalty of perjury, that the above statements in this Declaration, are true to the best of my knowledge, information, and belief."  Pl.'s Decl. at 15.  Because the Court concludes that the declaration does not contain evidence sufficient to establish a prima facie case of race discrimination, it need not decide whether the document is admissible as constituted.

contrary, the plaintiff admits that she did not believe the harassing behavior complained of in her

May 22, 2002 memorandum – from which her further claims of discrimination and retaliation all

ultimately flow – was motivated by racial animus.  Pl.'s Dep. at 57; Defs.' Mot. ¶ 19; Pl.'s Opp.

at 8 ¶ 19.  Thus, upon considering all of the exhibits, depositions, affidavits, and pleadings in this

case, the Court cannot conclude that the plaintiff has established a prima facie case of intentional

discrimination based on race, nor has the plaintiff shown "that a reasonable jury could conclude

from all the evidence that the adverse employment decision[s were] made for a discriminatory

reason."  Lathram, 336 F.3d at 1088.  In short, the plaintiff has "failed to make a sufficient

showing on an essential element" of her racial discrimination claims under the DCHRA and

Section 1981, and the defendants are entitled to summary judgment on those claims.[16]  Celotex,

477 U.S. at 323.

**B. The plaintiff's claims of retaliation**

The plaintiff has also failed to demonstrate that she "has been subjected to a pattern of

retaliatory acts" because of activity protected under the DCHRA or Section 1981.  Pl.'s Opp. at

2.  To make out a prima facie claim of retaliation under either statute, the plaintiff "must

establish (1) that she engaged in statutorily protected activity; (2) that the employer took an

---

[16] In her opposition to the defendants' motion for summary judgment, the plaintiff raises for the first time allegations of hostile work environment and constructive discharge.  Pl.'s Opp. at 21, 26.  However, the plaintiff cannot de facto amend her complaint by asserting new claims in her responsive pleadings to survive a motion for summary judgment.  See, e.g., Calvetti, 346 F. Supp. 2d at 107 (citing cases).  Therefore, the Court does not, and cannot, consider claims first raised in the plaintiff's opposition.  However, the Court notes that both hostile work environment and constructive discharge claims require the plaintiff to prove the existence of intentional discrimination.  See, e.g., Moore v. Ashcroft, 401 F. Supp. 2d 1, 42 (D.D.C. 2005) ("To establish a claim of hostile work environment based on race, a plaintiff must demonstrate . . . that he or she suffered intentional discrimination because of race") (internal quotation marks and citations omitted); Turner, 383 F. Supp. 2d at 171 ("An actionable constructive discharge claim requires a showing that . . . intentional discrimination existed").  Thus, because the Court concludes that the plaintiff has not provided sufficient evidence of intentional racial discrimination, these claims would nevertheless fail even if they were properly plead.

adverse personnel action; and (3) that a causal connection existed between the two." Fox, No.

03-2369, ___ F. Supp. 2d at ____, 2006 WL 751340 at *8 (quoting Mitchell v. Baldridge, 759

F.2d 80, 86 (D.C. Cir. 1985)) (internal quotation marks omitted) (DCHRA); see also Carter, 387

F.3d at 878 (Section 1981).  Even assuming arguendo that the plaintiff has satisfied the second

and third prongs of this test, the Court agrees with the defendants that the plaintiff's allegations

of retaliation are not based on any activity "statutorily protected" by the DCHRA or Section

1981.  Defs.' Reply at 9-12.

        An activity is "protected" for the purposes of a retaliation claim "if it involves opposing

alleged discriminatory treatment by the employer or participating in legal efforts against the

alleged treatment."  Coleman v. Potomac Elec. Power Co., No. 05-237, ___ F. Supp. 2d ____,

____, 2006 WL 751324, *2 (D.D.C. Mar. 21, 2006) (internal quotation marks and citation

omitted).  This "alleged discriminatory treatment," however, cannot be generic; rather, the

plaintiff must be opposing an employment practice made unlawful by the statute under which she

has filed her claim of retaliation.  Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006)

(stating that the complaint against which retaliatory conduct allegedly occurred "must in some

way allege unlawful discrimination").  In this instance, the plaintiff must demonstrate that she

had alleged harassment or discrimination based on her race, or some other category protected by

the DCHRA or Section 1981, before the retaliatory conduct occurred.  See, e.g., Coleman, No.

05-237, 2006 WL 751324 at *3 (agreeing with defendant that because the plaintiff "complained

about the evaluation process, his supervisors and harassment but not about matters protected by

anti-discrimination laws," he did not establish that he engaged in statutorily protected activity)

(internal quotation marks omitted); Macintosh v. Bldg. Owners and Managers Ass'n Int'l, 355 F.

Supp. 2d 223, 226 (D.D.C. 2005) (approving magistrate judge's conclusion "that the race-based element must lie in the protected activity") (internal quotation marks and citation omitted); Logan v. Dep't of Veteran Affairs, 404 F. Supp. 2d 72, 77 (D.D.C. 2005) (stating that the plaintiff did not engage in statutorily protected activity because her complaints regarding hospital practices did not "include a claim of discrimination based upon race, color, religion, sex, or national origin") (citation omitted).  The plaintiff has not done so.

As the defendants observe, "[t]he sole protected activity that [the p]laintiff identifies in this case is her May 2002 complaint of harassment against her supervisor, Marcia Betaharon." Def.'s Reply at 10; see also Pl.'s Opp. at 25 (stating that the plaintiff "engaged in protected activity when she raised the issues about being harassed and discriminated against, which allegations resulted in an investigation by [the Hospital's] human resources department");[17] Pl.'s Opp., Ex. F (May 22, 2002 memorandum in which the plaintiff states that she has "been the target of some very deliberate and cruel harassment devices employed by senior Team Leader, Marcia Betaharon").  This complaint alleges harassment "generally and generically . . . [and does] not refer to harassment [or discrimination] based on race or any other protected category recognized by either [the DCHRA] or Section 1981," Defs.' Reply at 10; see generally Pl.'s Opp., Ex. F.  Indeed, as already noted, the plaintiff herself admits that, at the time she filed the May 2002 complaint, she did not believe that Betaharon was harassing her because of her race. Pl.'s Dep. at 57; Defs.' Mot. ¶ 19; Pl.'s Opp. at 8 ¶ 19.  Furthermore, the plaintiff has not

_____

[17]  The next sentence of the plaintiff's opposition to the defendants' motion for summary judgment states that "[e]ven though the investigation claimed to find no evidence of harassment or racial discrimination, the allegations of [the plaintiff] nevertheless constituted protected activity."  Pl.'s Opp. at 25.  However, as discussed infra, the plaintiff has adduced no facts, whether in her May 2002 memorandum or in her pleadings in this case, suggesting that she had alleged discrimination based on race or otherwise engaged in behavior protected by the DCHRA or Section 1981 at the time of the investigation to which she refers.

proffered any other evidence which would suggest that she had complained of discrimination based on race, or otherwise engaged in activity protected by the DCHRA or Section 1981 before the allegedly retaliatory actions occurred.[18]  Accordingly, because the plaintiff "has not sufficiently demonstrated that she engaged in a protected activity," the Court concludes that she has failed to establish a prima facie case of retaliation.  Logan, 404 F. Supp. 2d at 76.  It therefore must grant the defendants' motion for summary judgment on the plaintiff's retaliation claims.

## C. The plaintiff's religious discrimination claim

As well as her racial discrimination and retaliation claims, the plaintiff appears to set forth in her complaint a claim for religious discrimination under the DCHRA, based on her suspension for refusing to take the PPD skin test despite her stated religious objections.[19]  Am. Compl. ¶¶ 1-2, 21.  Neither party devotes any attention to the plaintiff's religious discrimination allegation in their summary judgment pleadings, and the defendants discuss the plaintiff's refusal to take the PPD test solely in the context of her claim of retaliation.[20]  See Defs.' Mot. at 41-44;

---

[18]  The Court does not disagree with the plaintiff's contention that "even informal protests or accusations of discrimination are protected activity under anti-discrimination laws."  Pl.'s Opp. at 24 (citation omitted).  However, other than the May 2002 memorandum, which the plaintiff concedes does not relate to race, the plaintiff has not provided any evidence of informal protests or accusations of discrimination based on race or some other category protected under the DCHRA or Section 1981.

[19]  The plaintiff also appears to claim religious discrimination under Section 1981.  Am. Compl. ¶ 2.  However, religious discrimination claims are not cognizable under Section 1981, which is limited to the prohibition against racial discrimination.  Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987) (stating that Section 1981 "forbid[s] all racial discrimination in the making of private as well as public contracts") (internal quotation marks and citation omitted); see also Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 647 n.4 (M.D.N.C. 2004) (stating that "[S]ection 1981 does not protect against discrimination based on religion") (citations omitted); Farbstein v. Hicksville Pub. Library, 323 F. Supp. 2d 414, 417 (E.D.N.Y. 2004) (stating that "Section 1981 is grounded in racial discrimination and does not apply to actions alleging religious discrimination") (citation omitted).

[20]  For example, the defendants assert that the plaintiff's "prima facie retaliation claim fails because there is no evidence that Paula Sullivan knew of any protected activities on [the p]laintiff's part when she decided to place [the p]laintiff on the suspension list."  Defs.' Mot. at 42.

24

Defs.' Reply at 21-22.  Nevertheless, it is undisputed that the plaintiff, before her November

2003 suspension, provided the defendants with letters from the pastor of her church supporting

her religious objection to the tuberculin tests.  Defs.' Mot. ¶ 56; see also Defs.' Mot., Exs. 27 and

28.  Therefore, for the following reasons, the Court will address the plaintiff's allegation of

religious discrimination.

It is true that the plaintiff's complaint could have plead a religious discrimination claim

with greater clarity.  For example, the plaintiff does not specifically set forth religious

discrimination as one of her causes of action, Am. Compl. ¶¶ 24-34, and this failure is likely the

reason the defendants have not acknowledged the claim in their motion for summary judgment.

However, the plaintiff does state in the opening paragraph of her complaint that the DCHRA

"provid[es] for a private right of action against employment discrimination on the basis of, inter

alia, race . . . and religion."  Id. ¶ 1.  Further, the plaintiff explicitly states in her complaint that

she "refused to take the Mantoux PPD tuberculosis test on religious and medical grounds," id. ¶

21(k), and that she offered instead to take a sputum culture chest x-ray.  Id. ¶¶ 21(k), (l).  The

defendants also admit that the plaintiff requested to take the chest x-ray in lieu of the PPD test.

Defendants' Answer and Affirmative Defenses to Plaintiff's Amended Complaint at 5.

Moreover, the defendants include in their list of undisputed material facts a discussion of the

letters from the plaintiff's pastor, which "state that Tuberculosis tests are forbidden by the

religious tenants [sic] of the Congregation of Universal Wisdom."  Defs.' Mot. ¶ 56.

Accordingly, the Court concludes that the plaintiff's complaint, "when read as a whole under the

liberal pleading standards of Rule 8 of the Federal Rules of Civil Procedure, provide[d the]

defendants with sufficient notice of [the] plaintiff's claim" of religious discrimination under the

25

DCHRA.  Kivanc v. Ramsey, 407 F. Supp. 2d 270, 274 (D.D.C. 2006); see also Fed. R. Civ. P.

8(f); Conley v. Gibson, 355 U.S. 41, 47 (1957) (stating that "all the [Federal Rules] require is a

short and plain statement of the claim that will give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests") (internal quotation marks and citation

omitted).  The Court therefore construes the plaintiff's complaint as advancing a cause of action

for religious discrimination.

Having granted summary judgment on the plaintiff's federal and constitutional claims,

the Court may decline to exercise jurisdiction over the remaining pendent state law claim.  28

U.S.C. § 1367(c) (2000); see also Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005)

("A district court may choose to retain jurisdiction over, or dismiss, pendent state law claims

after federal claims are dismissed.") (citation omitted); Edmondson & Gallagher v. Alban

Towers Tenants Ass'n, 48 F.3d 1260, 1265-67 (D.C. Cir. 1995).  As in Edmondson & Gallagher,

"[t]he present case implicates two of the three specific bases for declining to exercise

supplemental jurisdiction under § 1367(c), each independently sufficient."[21]  43 F.3d at 1266.

First, there is no diversity jurisdiction in this case, Am. Compl. ¶¶ 6-7, and the Court has

now "dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).  "In

the usual case in which all federal-law claims are dismissed before trial, the balance of factors to

_____

[21]  The statute provides that

district courts may decline to exercise supplemental jurisdiction over a claim . . . if
(1) the claim raises a novel or complex issue of [s]tate law,
(2) the claim substantially predominates over the claim or claims over which the district court has
original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness,

and comity – will point toward declining to exercise jurisdiction over the remaining state law

claims." Shekoyan, 409 F.3d at 424 (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343,

350 n.7 (1988) (quotation marks omitted).

Second, as discussed below, the District of Columbia Court of Appeals has not squarely

addressed the standard by which claims of religious discrimination—particularly those such as

the plaintiff's—are to be analyzed under the DCHRA.  The plaintiff's remaining claim therefore

"raises a novel . . . issue of state law."  28 U.S.C. § 1367(c)(1).

As already noted, discrimination claims under the DCHRA, including religious

discrimination claims, are normally evaluated using the familiar McDonnell Douglas framework

developed for disparate treatment claims under Title VII.  Mungin, 116 F.3d at 1553; Klein v.

Derwinski, 869 F. Supp. 4, 8 (D.D.C. 1994) (stating that "where the [alleged] religious

discrimination involves termination rather than failure to accommodate, the case more closely

approximates those straightforward disparate treatment cases in which the plaintiff claims that

she was terminated because of her sex or race") (quoting Shapolia v. Los Alamos Nat'l Lab., 992

F.2d 1033, 1037 (10th Cir. 1993)) (internal quotation marks omitted).  The McDonnell Douglas

framework first requires the plaintiff to establish a prima facie case of religious discrimination.

Klein, 869 F. Supp. at 7; Rasul v. District of Columbia, 680 F. Supp. 436, 439 (D.D.C. 1988)

(applying McDonnell Douglas test to Title VII claim of religious discrimination).  Once a prima

facie case has been established, the burden shifts to the defendant to provide "some legitimate,

non-discriminatory reason for the [adverse employment actions], and to produce credible

evidence supporting its claim."  Johnson v. Dong Moon Joo, No. 01-0004, 2006 WL 627154,

*19 (D.D.C. Mar. 12, 2006) (citation omitted) (applying <u>McDonnell Douglas</u> to claim of

religious discrimination under Title VII, Section 1981, and the DCHRA).  If the defendant

successfully carries this burden, the plaintiff must then "show that [the d]efendant's proffered

reason was not the true reason for the employment decision."  <u>Id.</u> (citation omitted).

Title VII also has a separate provision prohibiting an employer from discriminating on the

basis of an individual's religion "unless [the] employer demonstrates that he is unable to

reasonably accommodate to an employee's . . . religious observance or practice without undue

hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j) (2000).  As the

Supreme Court has explained, this provision makes it "an unlawful employment practice . . . for

an employer not to make reasonable accommodations, short of undue hardship, for the religious

practices of his employees and prospective employees."  <u>Trans World Airlines, Inc. v. Hardison</u>,

432 U.S. 63, 74 (1977).  Moreover, Title VII's reasonable accommodations provision is not

governed by the <u>McDonnell Douglas</u> framework.  <u>See</u>, <u>e.g.</u>, <u>Baker v. Home Depot</u>, No. 05-1069,

___ F.3d _____, ____, 2006 WL 1030231, *4 (2d Cir. Apr. 19, 2006).  Although the Supreme

Court has declined to articulate a framework for cases in which an employer has allegedly failed

to accommodate an employee's religious beliefs under Title VII, <u>Ansonia Bd. of Educ. v.</u>

<u>Philbrook</u>, 479 U.S. 60, 67 (1986), other Circuits have stated that plaintiffs claiming religious

discrimination under Section 2000e(j) must first make a <u>prima</u> <u>facie</u> showing that "(1) they held a

bona fide religious belief conflicting with an employment requirement; (2) they informed their

employers of this belief; and (3) they were disciplined for failure to comply with the conflicting

employment requirement," <u>see</u>, <u>e.g.</u>, <u>Baker</u>, No. 05-1069, 2006 WL 1030231 at *4; <u>Storey v.</u>

<u>Burns Int'l Sec. Svcs.</u>, 390 F.3d 760, 767 n.17 (3d. Cir. 2004); <u>Jones v. TEK Indus., Inc.</u>, 319

F.3d 355, 359 (8th Cir. 2003); <u>Daniels v. City of Arlington</u>, 246 F.3d 500, 506 (5th Cir. 2001);

<u>Chalmers v. Tulon Co. of Richmond</u>, 101 F.3d 1012, 1019 (4th Cir. 1996).[22]   Once a plaintiff

successfully establishes a <u>prima</u> <u>facie</u> case, "the burden shift[s] to the employer to show that it

was unable reasonably to accommodate [the plaintiff's] religious needs without undue hardship."

<u>Daniels</u>, 246 F.3d at 506.

The DCHRA contains its own provision mandating reasonable accommodation for an

employee's religious observance "unless such accommodation would cause an employer undue

hardship."  D.C. Code § 2-1402.11(c) (2005).  However, while the DCHRA is "a broad remedial

statute [which] is to be generously construed," <u>George Wash. Univ. v. District of Columbia Bd.</u>

<u>of Adjustment</u>, 831 A.2d 921, 939 (D.C. 2003) (citation omitted), and "a powerful, flexible, and

far-reaching prohibition against discrimination of many kinds," <u>id.</u> (internal quotation marks and

citation omitted), its reasonable accommodation provision is more limited than its Title VII

counterpart, <u>compare</u> D.C. Code § 2-1402.11(c) <u>with</u> 42 U.S.C. § 2000e(j).  While the DCHRA

generally prohibits, <u>inter</u> <u>alia</u>, any discrimination on the basis of religion, Section 2-1402.11(c)

deals specifically with an employer's accommodation of work time lost due to an employee's

religious observance.  D.C. Code §§ 2-1402.11(a), (c).  By contrast, Section 2000e(j) "includes

all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), and, as

applied by the courts, requires an employer to reasonably accommodate any "bona fide religious

belief conflicting with an employment requirement . . . unless doing so would cause the employer

to suffer an undue hardship," <u>Baker</u>, No. 05-1069, 2006 WL 1030231 at *4 (internal quotation

---

[22]   The District of Columbia Circuit has indicated its approval of this <u>prima</u> <u>facie</u> framework, although it has not formally adopted it.  <u>Taub v. FDIC</u>, No. 96-5139, 1997 WL 195521, *1 (D.C. Cir. Mar. 31, 1997) (per curiam).

marks and citations omitted).  That is, an employee's religious belief that conflicts with an

employment requirement but that does not require the employee to miss work time for the

purposes of religious observance—such as an unwillingness to take a PPD skin test—would not

be covered by the limited scope of the District of Columbia's reasonable accommodations

provision, D.C. Code § 2-1402.11(c), whereas it <u>would</u> likely be considered a reasonable

accommodations case under the more expansive reach of Title VII, 42 U.S.C. § 2000e(j).[23]

Even beginning, then, with the proposition that "[t]he burdens of production and

persuasion for claims raised under the [DCHRA] are identical to those for claims alleging

discriminatory treatment in violation of Title VII," <u>Mungin</u>, 116 F.3d at 1553, it is not entirely

apparent which Title VII analytical framework properly applies to the plaintiff's DCHRA claim

of religious discrimination.  As noted, the plaintiff's claim is based on her suspension for

refusing to take a PPD skin test that was undisputedly a requirement of her employment, Defs.'

Mot. ¶ 44; Pl.'s Opp. at 12 ¶¶ 44-45, but her grounds for refusal, while religious in nature, cannot

be characterized as religious observance—that is, the need to miss work time for religious

purposes—under Section 2-1402.11(c).  Moreover, the distinction between failure to

accommodate cases and "straightforward disparate treatment cases" can be obscure, <u>Klein</u>, 869

F. Supp. at 8, as an employee's religious objections to a requirement of employment often lead to

suspension or termination, <u>see</u>, <u>e.g.</u>, <u>Baker</u>, No. 05-1069, 2006 WL 1030231 (plaintiff terminated

due to his refusal to work on Sundays); <u>Daniels</u>, 246 F.3d 500 (plaintiff terminated due to his

---

[23]  Such a case would nevertheless fall within the general ambit of the DCHRA, assuming a <u>prima facie</u> showing could be made.  D.C. Code § 2-1402.11(a) (stating that "[i]t shall be an unlawful discriminatory practice [for an employer to] discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment . . .; or otherwise [to] adversely affect [her] status as an employee" on the basis of religion).

refusal to remove cross pin from his uniform); Rasch v. Nat'l R.R. Passenger Co., No. 90-0913,

1991 WL 221270 (D.D.C. Oct. 11, 1991) (plaintiff terminated due to his refusal to work on the

Sabbath).  This Court's assessment of whether the plaintiff's religious discrimination claim

"more closely approximates" one of illegal termination or of failure to accommodate, Klein, 869

F. Supp. at 8, is made even more difficult by the plaintiff's own failure to clearly and distinctly

plead her cause of action in this regard, see supra.  And, of course, the Court is particularly

reluctant to evaluate the plaintiff's religious discrimination claim on its merits because neither

party has fully briefed the issue in their summary judgment pleadings.

    As another member of this Court has recently stated, it is "in the interests of comity [that]

federal judges should refrain from deciding cases founded solely on local law when the

requirements for diversity jurisdiction are not present." Mitchell v. Yates, 402 F. Supp. 2d 222,

235 (D.D.C. 2005) (citation omitted).  This is especially true where, as here, the remaining claim

presents a novel issue of state law.  28 U.S.C. § 1367(c)(1).  Moreover, because the plaintiff

originally filed her complaint in the Superior Court, it "would not adversely impact [her] ability

to pursue [her] claim[] in the local court system" if the Court were to decline to exercise

jurisdiction over the remaining claim of religious discrimination under the DCHRA.  Shekoyan,

409 F.3d at 424 (internal quotation marks and citation omitted).  Accordingly, the Court

concludes that "comity and fairness point strongly toward having the District of Columbia's

courts decide" the plaintiff's religious discrimination claim, while "judicial economy and

convenience . . . provide no serious counterweight." Edmondson & Gallagher, 48 F.3d at 1266.

The Court therefore declines to exercise supplemental jurisdiction over the plaintiff's pendent

state law claim.

The Court must now decide whether this matter should be dismissed without prejudice or remanded to the Superior Court.  Id. (stating that "[w]hether to remand or dismiss is a matter normally left to the discretion of the district court") (citing Carnegie-Mellon, 484 U.S. at 357). In this case, to dismiss the action and direct the plaintiff, who is once again pro se, to refile her complaint in the Superior Court would be needlessly duplicative and costly.  By contrast, to return the matter to the Superior Court would facilitate "convenience to the parties and a faster resolution of the case."  Id. at 1267.  The Court will therefore remand the plaintiff's remaining claim back to the Superior Court.

## IV. Conclusion

For the foregoing reasons, the Court concludes that, as to her racial discrimination claims under the DCHRA and Section 1981, the plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to [her] case, . . . on which [she] will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  The Court further concludes that the plaintiff has stated a cause of action for religious discrimination under the DCHRA, which neither side addressed in their summary judgment pleadings.  The Court therefore grants the defendants' motion for summary judgment on the plaintiff's racial discrimination claims and remands the religious discrimination claim to the Superior Court of the District of Columbia.

**SO ORDERED** this 4th day of May, 2006.[24]


                                        REGGIE B. WALTON
                                        United States District Judge

---

[24] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.